IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Rhonda McCrimmon, | ) | Civil Action  No. 5:11-1718-JFA-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and 5 U.S.C. § 706 to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act").

I.    Relevant Background

A.    Procedural History

Plaintiff applied for DIB and SSI under the Act on March 29, 2006. [1] Tr. 202, 205. Plaintiff's claims were denied initially on May 25, 2006, Tr. 76, and on reconsideration on October 6, 2006, Tr. 85, 88.  She requested a hearing before an administrative law judge ("ALJ"), Tr. 91, and hearings were held on October 8, 2008 and February 18, 2009, Tr. 59.  In a

---

[1] The date on the applications is April 12, 2006.

decision dated April 9, 2009, the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  Tr. 59-72.

Plaintiff requested that the Appeals Council review the April 9, 2009 decision and on August 7, 2009 the Appeals Council remanded Plaintiff's case to the ALJ for further administrative proceedings.  Tr. 74-75.  On October 14, 2010, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act, Tr. 11-23, and Plaintiff again requested review from the Appeals Council, Tr. 7. On June 2, 2011, the Appeals Council denied Plaintiff's request for review, Tr. 1-5, thereby rendering the October 14, 2010 decision of the ALJ the Commissioner's final decision for purposes of judicial review.  Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on July 18, 2011. ECF No. 1.

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was born in January 1975, and was 31 years old on January 30, 2006, the date of her alleged disability onset, and 35 years old on October 14, 2010, the date of the ALJ's decision before this court. Tr. 202.  Plaintiff has a high school education and past relevant work ("PRW") as an administrative assistant. Tr. 233, 236.  Plaintiff seeks DIB and SSI because she claims that her heart disease, migraines, and an anxiety disorder prevent her from working.  Tr. 232.

2.      Relevant Medical History

a.      Palmetto Primary Care Physicians

Plaintiff was seen by Dr. Amy Black on March 6, 2006 complaining of feeling lightheaded, passing out, sleeping a lot, and she indicated an increase in her stress level. Tr. 383. Upon examination she had normal heart sounds and physiologic rhythm, but appeared anxious,

depressed, and irritable. Tr. 329. Dr. Black assessed her with anxiety. *Id.* In a follow-up visit on March 21, 2006, Plaintiff indicated she was still light-headed and still had a high level of stress. Tr. 330. She also complained of migraine, and indicated she had "passed out" on the Saturday preceding the office visit. *Id.* Dr. Black assessed her with unstable migraine headache, new syncope, and unchanged anxiety. Tr. 331. She provided her with samples of Maxalt 10 mg. and discontinued Diflucan 150 mg and Prevacid 30 mg. *Id.* Dr. Black referred Plaintiff for a neurology consultation for the syncope and migraines as she did not think the syncope was cardiogenic. *Id.* She encouraged Plaintiff to consider stress management counseling. *Id.*

Plaintiff returned for follow-up on April 12, 2006. Tr. 332. Dr. Black assessed her with tachycardia-bradycardia, unchanged syncope, unstable anxiety, and improving migraine headache. Tr. 333. He prescribed aspirin 81 mg., refilled her prescriptions for Maxalt 10 mg. and Topamax 25 mg., increased her Zoloft prescription to 100 mg., and gave her an injection of Toradol 60 mg. *Id.*

Plaintiff presented to Dr. Black on May 5, 2006 so that she could complete paperwork for financial help. Tr. 409. Plaintiff reported the severity of stress and episodes of "passing out" was worsening. *Id.* Dr. Black completed a South Carolina Department of Social Services ("DSS") Physician's Statement on May 5, 2006. Tr. 364. She opined that Plaintiff was unable to engage in any type of employment because she had syncopal episodes under medical evaluation. *Id.* When Plaintiff would be able to work was "to be determined." *Id.* Dr. Black's prognosis was that Plaintiff's condition was "potentially" permanent, but "further eval[uation] will tell." *Id.*

Plaintiff returned on May 19, 2006 for follow-up of syncope. Tr. 411. She reported one episode since her last visit. *Id.* Dr. Black scheduled follow-up in one month. Tr. 412.

Plaintiff saw Dr. Black on June 7, 2006 complaining of hives and sore ribs. Tr. 413. Plaintiff reported that her ex-husband attacked her, grabbed her throat, and beat her in the ribs. *Id.*

### b. Cardiology Consultants of Charleston, P.A.

Plaintiff was seen by Dr. Mark A. Mataosky of Cardiology Consultants of Charleston on January 4, 2006, subsequent to treatment in the emergency room ("ER") on December 29, 2005 complaining of chest discomfort. Tr. 346. In his assessment he indicated her symptoms may be secondary to stress. Tr. 347. Dr. Mataosky saw Plaintiff in a follow-up examination on January 17, 2006, and Plaintiff stated that she "believes her symptoms are due to her stressful situation at home." Tr. 345. Dr. Mataosky found no evidence of ischemic heart disease and noted she had normal LV function. *Id.*

Plaintiff presented to Dr. Mataosky on February 7, 2006 with complaints of feeling very fatigued, weak, and occasionally lightheaded. Tr. 341. Dr. Mataosky assessed that it would be unlikely that there was a cardiac etiology of her symptom, but placed a Holter monitor on her to assess for any significant arrhythmias. *Id.* Plaintiff requested a work release until after she was seen back in the office. Tr. 342. Dr. Mataosky noted she could return to work after seeing Dr. Black. *Id.*

Plaintiff was seen by Dr. Mark Mataosky on March 3, 2006, for evaluation due to episodes of fatigue and weakness. Tr. 338. Plaintiff reported her symptoms were "somewhat improved, although on occasion, she feels very tired." *Id.* The Holter monitor revealed no abnormalities, and no arrhythmias. Tr. 338. Dr. Mataosky found that no further cardiac work-up was indicated. Tr. 339. Plaintiff indicated she would follow-up with Dr. Black for possible treatment of depression. Tr. 339.

Dr. Mataosky saw Plaintiff for an office visit on April 19, 2006. Tr. 335. Plaintiff reported having a syncopal episode approximately three days prior to the appointment. *Id.* Dr. Mataosky "interrogated her pacemaker" and noted that it was sensing and functioning appropriately. *Id.* The 24-hour Holter monitor showed normal sinus rhythm, and her echocardiogram showed normal function. *Id.* Her pacemaker was sensing and functioning appropriately. *Id.* Dr. Mataosky noted her upcoming appointment with neurology and prescribed atenolol 25 mg., although unsure it would help "as her resting heart rate is in the 60's." Tr. 336.

Plaintiff returned for an office visit on June 20, 2006, reporting recurrent syncopal events. Tr. 404. In his assessment Dr. Mataosky reported Dr. Dukes' note that the events were not witnessed. *Id.* Dr. Mataosky noted that it was possible Plaintiff's symptoms were stress induced and he was unable to find any cardiac reason for the recurrent syncope. Tr. 405.

c. Psychiatric Consultant ("PC") Judith Von, Ph.D.

PC Von completed a Psychiatric Review Technique form ("PRTF") on May 5, 2006. Tr. 350-63. She noted a non-severe impairment of mild depression and mild anxiety. Tr. 350, 353, 355. PC Von indicated mild functional limitations and no episodes of decompensation. Tr. 360.

d. Medical Consultant ("MC") William Cain, M. D.

Dr. Cain completed a physical residual functional capacity ("RFC") assessment of Plaintiff on May 24, 2006. Tr. 367-74. The primary diagnosis was possible syncopal episodes. Tr. 367. Dr. Cain opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, could stand and/or walk or sit with normal breaks for six hours in an eight-hour work day, and had unlimited push and/or pull capability. Tr. 368. Dr. Cain noted that Plaintiff had a pacemaker due to tachy/brady [tachycardia/bradycardia] syndrome, but he noted the alleged syncope episodes were not necessarily related to the heart. *Id.* He noted Plaintiff's

alleged migraines and GERD [gastro esophageal reflux disease] and opined that it appeared Plaintiff needed some restrictions. *Id.* Dr. Cain opined that Plaintiff could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. Tr. 369. She could occasionally balance, stoop, kneel, or crouch. *Id.* He noted no other limitations.

e.      Trident Medical Center

Plaintiff was seen in the ER on December 29, 2005 complaining of chest pain. Tr. 388. After examination, Plaintiff was diagnosed with acute chest pain and GERD. Tr. 389. Plaintiff was prescribed Pepcid and aspirin, instructed to follow-up with Dr. Mataosky, and discharged. Tr. 393.

Plaintiff underwent a consultation with Dr. Brett Baker on July 18, 2006, as a referral for tilt table testing. Tr. 417. She reported having one syncope episode per week. *Id.* Dr. Baker conducted the tilt table test. He noted that Plaintiff "may be experiencing transient hypotension although etiology of her syncope is unclear." Tr. 419. Dr. Baker recommended beginning a trial of Midodrine 5mg., and Plaintiff was instructed to take her blood pressure twice daily. *Id.*

f.      Carolina Neurological Clinic, L.L.P.

Complaining of loss of consciousness, seizures, and migraines, Plaintiff was examined by Dr. Thomas H. Dukes, III on May 11, 2006 on referral from Dr. Black. Tr. 400-02. Upon examination Dr. Dukes noted Plaintiff's history of migraine and advised her to increase Topomax to 50 mg. and continue Maxalt. Tr. 402. Dr. Dukes recommended Plaintiff have a CT scan and EEG, and if those studies did not reveal anything then perhaps a tilt table test. *Id.*

Plaintiff followed up with Dr. Dukes on June 8, 2006. Tr. 399. Her CT scan and EEG were normal. *Id.* Dr. Dukes opined that it was unlikely Plaintiff was experiencing seizures, and he was reluctant to diagnose her with epilepsy. *Id.* He noted that she appeared to have syncope

and indicated that perhaps she should be seen by an electrophysiologist. *Id.* He continued her medications and scheduled follow-up in two months. *Id.*

g.      Charleston/Dorchester Mental Health Clinic ("MHC")

Plaintiff went to MHC for her initial assessment on July 11, 2006. Tr. 462. She indicated that she had no previous mental health treatment. *Id.* Plaintiff reported episodes of syncope and that she was restricted from work due to the episodes. *Id.* Her diagnosis was "MDD single episode moderate to severe" with PTSD. Tr. 463.  The doctor increased her current prescriptions for Zoloft and Xanax. *Id.*

Plaintiff was seen on July 17, 2006, and reported sleep disturbance and head pain. Tr. 440. She was instructed to continue medications of Zoloft and Xanax to manage her mood and anxiety. *Id.* Plaintiff returned for follow-up on July 31, 2005 and reported that her mood was "better." *Id.*

Plaintiff cancelled her scheduled appointment on August 29, 2006, and was a "no-show" for her scheduled appointment on September 5, 2006. Tr. 439. Plaintiff was seen on September 8, 2006, and reported feeling very sad about the recent finalization of her divorce. Tr. 438. The doctor increased her prescription for Zoloft for treatment of her symptoms of depression and anxiety. *Id.*   She was seen again on September 22, 2006, and reported a physical altercation with a neighbor. Tr. 459. She was a "no-show" for her scheduled September 26, 2006 appointment, but was seen in October 2006 when she reported her mood was better and sleep adequate. Tr. 458.

h.      PC Jeffrey Vidic, Ph.D.

PC Vidic completed a psychiatric review of Plaintiff on September 26, 2006. Tr. 443-56. He opined Plaintiff had a non-severe impairment of depression and anxiety. Tr. 443, 446, 448.

PC Vidic noted mild functional limitations, and no episodes of decompensation. Tr. 453. He noted Plaintiff's activities of caring for her three children, performing household chores with help from the children, taking clothes to the laundromat three times per month, helping children with their homework, and grocery shopping. Tr. 455. Plaintiff continued to drive, and denied difficulty with her ability to handle money. *Id.*

### i.     MC Jean Smolka, M.D.

Dr. Smolka completed a physical RFC assessment of Plaintiff on October 2, 2006. Tr. 469-76. Plaintiff's primary diagnosis was heart disease, and her secondary diagnosis was syncopal episodes. Dr. Smolka opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, could stand and/or walk or sit with normal breaks for six hours in an eight-hour work day, and had unlimited push and/or pull capability. Tr. 470. Dr. Smolka opined that Plaintiff could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. Tr. 471. She could occasionally balance, stoop, kneel, crouch or crawl. *Id.* She noted no manipulative, visual, or communicative limitations, but did note Plaintiff should avoid all exposure to environmental hazards, such as machinery or heights. Tr. 473. Dr. Smolka considered the opinion of Plaintiff's treating physician, Dr. Black, that stated Plaintiff should not drive or work secondary to syncopal episodes and possible neurological disorder. Tr. 475.

### j.     Carolinas Hospital System

Plaintiff reported to the ER on August 27, 2007, complaining of chest pain. Tr. 529. Plaintiff reported being under a lot of stress and noted that stress and worry made the chest pain worse. *Id.* After examination she was instructed to follow-up with a doctor regarding anxiety disorder and regarding hyperglycemia to rule out diabetes. Tr. 531.

Plaintiff returned on September 6, 2007 because of seizures. Tr. 659. Plaintiff was treated and discharged. Tr. 663.

Plaintiff reported to the ER on January 26, 2008 complaining that she was "so stressed out." Tr. 648. No acute distress was noted, and no seizure activity was noted. Tr. 650. Plaintiff was discharged with instructions to take medications. *Id.*

  k.  Comprehensive Neurological Services, P.C.

Plaintiff was seen on May 9, 2007 to begin procedures for testing of "syncope versus seizures and migraines." Tr. 544-46. Plaintiff underwent testing for auditory brainstem evoked response, nerve conduction studies, visual evoked response, EEG, and noninvasive carotid studies on May 30, 2007, Tr. 539-43. All results were normal. *Id.* On July 13, 2007, Dr. W. James Evans performed a nocturnal polysomnogram. Tr. 535. He noted possible restless leg syndrome and possible narcolepsy, and recommended further evaluation. Tr. 535-36. Plaintiff underwent a multiple sleep latency test on August 29, 2007 to rule out narcolepsy. Tr. 533. Dr. Evans noted that Plaintiff had severe daytime drowsiness consistent with narcolepsy, but clinical correlation was required. *Id.*

On August 7, 2007, Nurse Practitioner B. Floella Shupe, completed a DSS medical release form, noting that Plaintiff was "currently totally disabled [and] unable to work." Tr. 696. The disabling diagnosis was syncopal episodes, possible seizures, and possible narcolepsy. Tr. 697.

Dr. Evans saw Plaintiff on October 1, 2007 in a follow-up examination. Tr. 599-600. Plaintiff indicated she continued to have excessive daytime drowsiness and the single dose of Provigil did not help keep her awake. Tr. 599. She did note that the Topomax helped to prevent migraines and Depakote helped reduce her staring spells. *Id.* Dr. Evans recommended increasing

the dosage of Provigil to 200 mg and asking her cardiologist for permission to use amphetamines. Tr. 600.

Plaintiff returned to the office on September 8, 2008 after an approximate one year absence. Tr. 698. She reported that she had two seizures a week and almost daily migraine headaches. *Id.* She stated that the numbness and pain in her hands returned after she ran out of samples of Requip, and that she was often sleepy. *Id.* Nurse Practitioner Shupe adjusted her medications and also prescribed Maxalt and Lorcet for the migraines. *Id.* When Plaintiff returned on October 22, 2008, she reported that her seizure activity and migraines had decreased. Tr. 701.

Dr. Evans' notes of February 10, 2009 indicated Plaintiff was still having frequent syncopal episodes. Tr. 702. Dr. Evans adjusted her medications and noted that he did not think Plaintiff was able to work in any capacity due to her medical problems, and opined she was "permanently and totally disabled." Tr. 703. In a follow-up visit on January 7, 2010, Plaintiff reported that she was having worse syncopal spells and staring spells, but indicated she was under more stress due to family problems. Tr. 704.

    C.    The Administrative Proceedings

        1.    Plaintiff's Hearing Testimony

At the time of the September 30, 2010 hearing, Plaintiff was divorced, and she and her three children, ages 16, 11 and nine, had moved in with her parents in Summerville, South Carolina for health reasons. Tr. 34-35. Plaintiff testified that she was getting public assistance, child support and food stamps. Tr. 35. She stated that she completed high school, was 4'11" in height, and weighed 196 pounds. Tr. 36. Plaintiff admitted to being overweight, and noted her doctors had instructed her to lose weight. *Id.* Plaintiff testified that she drove a car and did not

have a restricted driver's license, but she only drove if she had to drive. Tr. 37. Plaintiff's PRW included administrative or clerical work for Auto Glass, K.D. Poston furniture store, APN Insurance, One Source Communication, Credit Central, and Advance Check. Tr. 38-39. Plaintiff's last employer was Advance Check in 2006. Tr. 39.

Plaintiff has a pacemaker that was implanted in 2005 to regulate her heart beats. Tr. 40, 42. She testified that she was unable to work full time because of her seizures, heart, and stress. Tr. 41. Plaintiff stated that when she was under a lot of stress it would cause her to pass out. *Id*. She indicated that would happen once a month, or twice a month at the most. *Id*. She testified that her stressors were financial problems and her children, but she also testified that her work at the finance company was "very stressful." *Id*. Plaintiff indicated that she took several medications including Lorcet, Depakote, migraine pills, aspirin, Effexor, and anxiety medication. Tr. 43-44. Plaintiff testified that medication caused her to sleep a lot. Tr. 43. She testified that because of that side effect she was unable to take care of her children. Tr. 46. She stated that she slept five to six hours a day. *Id*.

### 2. Vocational Expert ("VE") Testimony

VE Mary Cornelius testified at Plaintiff's administrative hearing and described Plaintiff's prior work. She indicated the PRW, as well as the exertional levels and specific vocational preparation ("SVP") each job required, as indicated in the Dictionary of Occupational Titles ("DOT"). Tr. 48-49. Plaintiff's work as an administrative clerk was DOT light, semiskilled, SVP four and her work as assistant manager was light, skilled, and SVP seven. *Id*. The ALJ posed the hypothetical of a younger individual with a high school education and semiskilled to skilled work background with light exertion who should not drive motorized equipment, should not climb or balance, but could occasionally stoop, kneel, crouch, and crawl. Tr. 49. The

individual needed to avoid dangerous heights and dangerous machinery, and could perform only routine simple work, with no interaction with the public, and no piece-rate work. *Id.* The VE testified that simple routine work would rule out any PRW. *Id.* The ALJ asked if there were any occupations in the regional or national economies for a person of those limitations. The VE testified the jobs of garment folder, mail sorter, and office helper would be available. Each job was light and unskilled, with SVP of two. Tr. 50. The ALJ asked if any of those jobs, or any jobs would provide for a reclining position due to the need to lie down during the day because of fatigue and weakness, and the VE responded "no." *Id.* The VE testified that if an individual missed two or more days per month, they would not be expected to retain the position. *Id.*

II. Discussion

A. The ALJ's Findings

In his October 14, 2010, decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2. The claimant has not engaged in substantial gainful activity since January 30, 2006, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: cardiac problems, narcolepsy, staring spells and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416. 967(b) except no driving motorized equipment; occasional stooping, kneeling, crouching and crawling; no climbing or

balancing. The claimant is further restricted to simple, routine tasks, and no work with the public as customers. She should work alone or in a small group, and not be involved in performing piece rate or quota work.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 23, 1975, and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 30, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 11-23.

B.  Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

(1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner  made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*,  *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial

evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

1.    Opinions of Treating Physicians

Plaintiff first argues that the ALJ's finding that she had the RFC to perform light work is not supported by substantial evidence because the ALJ disregarded the opinions of her physicians. Pl.'s Br. 3-6.[3] Plaintiff argues that the "ALJ should have granted significant weight to the opinions of [her] family doctor, Dr. Black, nurse practitioner B. Floella Shupe, and [her] neurologist, Dr. W. James Evans." Pl.'s Br. 3. The Commissioner asserts that the ALJ properly evaluated Plaintiff's RFC and properly gave less than controlling weight to the opinions of Dr. Black, nurse practitioner Shupe, and Dr. Evans. Def.'s Br. 8-10. The undersigned agrees.

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v.*

_____

[3] The pages of Plaintiff's brief are unnumbered. The referenced page numbers refer to the EFC numbering in ECF No. 10.

*Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527 (d)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(d). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. Further, in undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

Plaintiff argues it was error to discount the opinions of Dr. Black and Ms. Shupe because, despite the lack of a definitive diagnosis and restrictions, the ALJ should have considered the overall impairments caused by Plaintiff's symptoms on her ability to work. Pl.'s Br. 5. However,

the ALJ's decision clearly states that he considered the combined effect of Plaintiff's impairments and complaints in developing her work restrictions. Tr. 21. Having reviewing the record, the undersigned finds the ALJ appropriately considered the opinions of Dr. Black and Ms. Shupe. The ALJ examined Dr. Black's 2006 notes and her diagnosis and assessment of Plaintiff. Tr. 14-16. Dr. Black's opinion was that Plaintiff was unable to work "at [that] time" and it was "to be determined" when she would be able to work. Tr. 364. The ALJ also considered the August 2007 opinion of nurse practitioner Shupe, and her 2008 and 2010 treatment notes. Tr. 19. Ms. Shupe opined that Plaintiff was totally and permanently disabled. Tr. 696-97. The ALJ did not give Dr. Black's or Ms. Shupe's opinions controlling weight because there were no specific limitations or restrictions in their opinions. Tr. 20. The ALJ need not give deference to this type of opinion. *Compare* 20 C.F.R. § 416.927(e) (indicating Commissioner gives no special significance to opinions of treating sources regarding issues reserved to the Commissioner, such as whether a claimant is disabled), *with* 20 C.F.R. § 416.927(a), (b) (indicating Commissioner considers medical opinions, defined as statements "from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments, including [] symptoms, diagnosis and prognosis, what [claimant] can still do despite impairment(s), and [claimant's] physical or mental restrictions.").

Plaintiff argues that the ALJ erred in not giving Dr. Evans's opinion controlling weight. Plaintiff asserts that the most severe impairment contributing to her disability is narcolepsy and Dr. Evans's opinion that she was unable to work because of narcolepsy was "well supported" by "medically acceptable clinical and laboratory diagnostic techniques." Pl.'s Br. 5. The ALJ reviewed Dr. Evans's treatment notes, evaluations, and impressions from 2007 and his 2009 letter opinion that Plaintiff was permanently and totally disabled. Tr. 16-19. He did not give Dr.

Evans's opinion controlling weight because it was not based on diagnostic findings and there was no evidence of seizure activity from testing conducted on Plaintiff. Tr. 20.

In defense of Dr. Evans's opinion and why it should be given controlling weight, Plaintiff points to specific medical records that she claims provide sufficient objective medical evidence to support a diagnosis of narcolepsy. Pl.'s Br. 6. However, none of Plaintiff's record citations provide a definitive diagnosis for narcolepsy. For example, Dr. Evans's notes from various sleep studies of Plaintiff state the results were "suggestive of narcolepsy" or "consistent with narcolepsy" but required clinical correlation. *See* Tr. 532-34. Dr. Evans further stated that Plaintiff possibly had narcolepsy "although MSLT [multiple sleep latency test] was somewhat atypical." Tr. 598-99. Plaintiff provided a medical history to nurse practitioner Bonita McCray and self-reported that she had narcolepsy. Tr. 692-93. The ALJ owed no deference to this background information. The notes of nurse practitioner Shupe indicated that Plaintiff complained of excessive daytime drowsiness which Ms. Shupe opined was "consistent with narcolepsy." Tr. 698, 701. However, this was not a diagnosis. Therefore, the ALJ's finding that Dr. Evans's opinion was not based on diagnostic findings or evidence is accurate. The undersigned finds the ALJ considered and evaluated evidence as required, and his conclusion is supported by substantial evidence. Furthermore, even if the evidence Plaintiff highlights could support a different result, the court's role is not to second-guess the ALJ's findings. Rather, when "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the . . . ALJ[]." *Craig*, 76 F.3d at 590 (internal quotation omitted).

Because the ALJ appropriately considered and discounted the opinions of Dr. Black, nurse practitioner Shupe, and Dr. Evans, the undersigned recommends that the court dismiss Plaintiff's first allegation of error.

2.      Plaintiff's Credibility

Plaintiff's second allegation of error is that the ALJ should have found her "testimony concerning the intensity, persistence and limiting effects of her impairments credible" and the ALJ should have provided specific reasons for his decision concerning her statements. Pl.'s Br. 6-7.

The ALJ considered the objective medical evidence, as well as Plaintiff's subjective complaints, and found her claimed limitations were not credible *to the extent they were inconsistent* with his RFC assessment. Tr. 21 (emphasis added). He cited to five years of medical records and diagnostic test results. Tr. 14-20. For example, the ALJ discussed Dr. Lowe's 2005 and 2006 treatment notes referencing syncope, but noted testing showed normal heart function. Tr. 14.  He also pointed to examinations and testing done by Dr. Mataosky, Dr. Dukes, Dr. Baker, Dr. Evans, Dr. Malik, Dr. Freel, and emergency room doctors who all reported that x-rays, stress tests, EEG's, tilt table testing, pacemaker examinations, and EKG's were all normal. Tr. 14-20.

Plaintiff's second allegation of error should be dismissed. The ALJ considered the record evidence and discussed much of the evidence he considered, which provided reasons for the restrictions he placed on Plaintiff's RFC.

3.      Effect of Plaintiff's Limitations on Ability to Work Full-time

Plaintiff's final argument is the ALJ erred in assessing Plaintiff's RFC by failing to provide evidence to show she can work full-time. Pl.'s Br. 8. "Ordinarily, RFC is an individual's

maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis….mean[ing] 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. As the Commissioner notes, there is no indication the ALJ used the term RFC in any manner other than how it is defined in the regulations and rulings. The ALJ stated that he considered the total evidence of record, the combined effect of Plaintiff's impairments, Plaintiff's subjective complaints, and her testimony. Tr. 20-21. The ALJ's finding that Plaintiff could perform light work with restrictions as noted is supported by substantial evidence in the record. *See Williams v. Astrue*, No. 4:10-cv-2966-TER, 2012 WL 694038, at *9 (D.S.C. Mar. 5, 2012) (finding ALJ's opinion sufficiently explained how he determined Plaintiff's RFC); *see, e.g. Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir.2006) ("In light of SSR 96–8p, [the ALJ's] conclusion [that claimant could perform a range of sedentary work] implicitly contained a finding that [claimant] physically is able to work an eight-hour day.") Accordingly, the ALJ did not err in considering Plaintiff's limitations on her ability to work full-time.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned finds that the Commissioner performed an adequate review of the whole record, including evidence regarding Plaintiff's mental and physical conditions, and that the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 1631(c)(3) of the Act, 42 U.S.C. Sections 405(g) and 1383(c)(3), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

May 21, 2012                                  Kaymani D. West
Florence, South Carolina                      United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**